FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF THE DISTRICT OF COLORADO**

2018 APR -4  PM 2: 51

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, | CASE NO.:_____ |
| KATHRYN MCIVER | **COMPLAINT** |
| 1180 South Fenton Street | |
| Lakewood, CO 80232 | **FILED UNDER SEAL** |
| | PURSUANT TO |
| and | 31 U.S.C. § 3730(b)(2) |
| CASSANDRA OHNSTAD | |
| 23 Pipit Lake Court | **JURY TRIAL DEMANDED** |
| Erie, CO 80516 | |

UNITED STATES OF AMERICA, *ex rel.*, )
)
)
KATHRYN MCIVER )
1180 South Fenton Street )
Lakewood, CO 80232 )
)
)
and )
)
)
CASSANDRA OHNSTAD )
23 Pipit Lake Court )
Erie, CO 80516 )
)
Plaintiff-Relators, )
)
)
BRINGING THIS ACTION ON BEHALF )
OF THE UNITED STATES OF AMERICA )
)
c/o )
CIVIL PROCESS CLERK )
UNITED STATES ATTORNEY )
1801 California Street, Suite 1600 )
Denver, CO 80202 )
)
ATTORNEY GENERAL OF )
THE UNITED STATES )
U.S. Department of Justice )
950 Pennsylvania Avenue )
Washington, DC 20530 )
)
v. )
)
ACT FOR HEALTH, INC. D/B/A )
PROFESSIONAL CASE MANAGEMENT )
500 E. Eighth Avenue )
Denver, CO 80203 )
)
and )
)
KEVIN VOLLMER )
500 E. Eighth Avenue )
Denver, CO 80203 )
)
DEFENDANTS. )

## COMPLAINT AND JURY DEMAND

1.      This is an action filed under the *qui tam* provisions of the False Claims Act,

31 U.S.C. § 3729, *et seq.*, by Plaintiff-Relators Kathryn McIver and Cassandra Ohnstad, in

the name of the United States of America and themselves to recover penalties and damages

caused by Professional Case Management ("PCM"), PCM's sole owner Kevin Vollmer

and affiliated entities (collectively, "Defendant") for material misrepresentations to the

United States of America in billing claims made for home health care services under the

Energy Employees Occupational Illness Compensation Program Act ("EEOICPA")

programs.

2.      Defendant knowingly files reimbursement claims acting as an agency for

professional services while being unlicensed in the state where such services are provided.

3.      Defendant actively hides its lack of licensing both from state governmental

agencies and from the United States Department of Labor (the "Department"), which

ultimately reimburses Defendant for the services. For the sole reason of avoiding

accountability and maximizing profits, Defendant cuts corners by avoiding state oversight,

refusing to report incidents of abuse and neglect, and not providing mandatory training for

employees, among other requirements it violates to minimize oversight and overhead costs.

For the sake of higher profits, Defendant outright lies to the United States of America, and

knowingly puts it patients at risk of harm.

4.      Defendant also submits bills to be paid by the Department for a higher level

of services than actually provided, and frequently induces patients to accept a higher level

of care than is medically necessary through coercion, improper encouragement, and

kickbacks. At times, Defendant does so by providing payments to relatives of the patients

by hiring the relatives as "caregivers." While hiring patient relatives as "caregivers" is

lawful on its own, Defendant does so to induce patients to accept higher levels of care than is medically necessary in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a–7b.

5.      Accordingly, the Plaintiff-Relators file this action to recover damages and civil penalties on behalf of themselves and the United States of America.

## I.      JURISDICTION AND VENUE

6.      This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

7.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

8.      Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because (a) Defendant regularly transacts business in the United States District of Colorado, and have done so at all times relevant to this Complaint and (b) the FCA confers national jurisdiction.

## II.      PARTIES

9.      Plaintiff-Relator Kathryn McIver is PCM's current Senior Director of Clinical Operations and has been employed by PCM since December 2015. She is and has at all times relevant to this action been a resident of the State of Colorado and a citizen of the United States of America.

10.      Plaintiff-Relator Cassandra Ohnstad is PCM's former Vice President of Human Resources and was employed at PCM for approximately nine (9) years until May 9, 2017. She is and has at all times relevant to this action been a resident of the State of Colorado and a citizen of the United States of America.

11.      There has been no public disclosure of the allegations contained in this Complaint.

12.     Kathryn McIver and Cassandra Ohnstad are each an original source of the information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(B).

13.     Ms. McIver has direct and independent knowledge of the information contained herein and has voluntarily provided such information to the United States of America prior to filing this action.

14.     Ms. Ohnstad has direct and independent knowledge of the information contained herein and has voluntarily provided such information to the United States of America prior to filing this action.

15.     Defendant ACT for Health, Inc. is the owner of the trade name and conducts business as Professional Case Management ("PCM") of 500 East Eighth Avenue, Denver, CO 80203. According to its website, this entity is the first and largest home health care provider to serve workers who are eligible for benefits under the federal Energy Employees Occupational Illness Compensation Program Act ("EEOICPA") program. Hereinafter this entity and any affiliated organizations is collectively referred to as "PCM." PCM and Defendant Kevin Vollmer are collectively referred to as "Defendant."

16.     PCM is an enrolled EEOICPA home healthcare provider with the Department of Labor and has been providing home healthcare services to EEOICPA-eligible patients since 2002. PCM enjoys annual revenues of approximately one-hundred twenty million dollars ($120 million) nationwide, of which at least twenty-five percent (25%) is obtained through the fraudulent activity detailed herein.

17.     Defendant Kevin Vollmer is a natural person, and upon information belief is the sole owner of PCM. Upon information and belief, Vollmer is, and at all times relevant to this action has been, a citizen of the United States of America and a resident of the State of Colorado.

4

### III.     Legal Background

**EEOICPA regulations which are material to all PCM claims.**

18.     The EEOICPA was enacted in the year 2000 to compensate for and provide medical care to eligible workers who have become ill because of their employment at federal weapons sites.

19.     Medical providers who provide services under the EEOICPA must comply with the regulatory structure established by the EEOICPA, 42 U.S.C. § 7384 *et seq.*, and its implementing regulations, 20 C.F.R. § 30 *et seq.*

20.     Defendant's fraudulent practices violate the requirements of the Energy Employees Occupational Illness Compensation Program Act, 42 U.S.C. § 7384 *et seq.*, and its implementing regulations, 20 C.F.R. § 30 *et seq.*

21.     The EEOICPA provisions are similar to provisions which require providers to comply with Medicare regulations to request reimbursement under other government programs. For example, the EEOICPA requires providers to keep records of their patients as follows:

> Federal Government medical officers, private physicians and hospitals are required to keep records of all cases treated by them under EEOICPA so they can supply OWCP [Office of Workers' Compensation Programs] with a history of the claimed occupational illness or covered illness, a description of the nature and extent of the claimed occupational illness or covered illness, the results of any diagnostic studies performed, and the nature of the treatment rendered. This requirement terminates after a provider has supplied OWCP with the above-noted information, and otherwise terminates ten years after the record was created.

20 C.F.R. § 30.700.

22.     The EEOICPA also imposes requirements upon providers regarding how medical bills are to be submitted, and each bill submitted creates a certification as to compliance with all requirements of the EEOICPA program:

(a) All charges for medical and surgical treatment, appliances or supplies furnished to employees, except for treatment and supplies provided by nursing homes, shall be supported by medical evidence as provided in § 30.700. The physician or provider shall itemize the charges on Form OWCP-1500 or CMS-1500 (for professional charges), Form OWCP-04 or UB-04 (for hospitals), an electronic or paper-based bill that includes required data elements (for pharmacies), or other form as warranted, and submit the form or bill promptly for processing.

(b) The provider shall identify each service performed using the Physician's Current Procedural Terminology (CPT) code, the Healthcare Common Procedure Coding System (HCPCS) code, the National Drug Code (NDC) number, or the Revenue Center Code (RCC), with a brief narrative description. Where no code is applicable, a detailed description of services performed should be provided.

(c) For professional charges billed on Form OWCP-1500 or CMS-1500, the provider shall also state each diagnosed condition and furnish the corresponding diagnostic code using the "International Classification of Disease, 9th Edition, Clinical Modification" (ICD-9-CM), or as revised. A separate bill shall be submitted when the employee is discharged from treatment or monthly, if treatment for the occupational illness is necessary for more than 30 days.

(d) By submitting a bill and/or accepting payment, the provider signifies that the service for which payment is sought was performed as described and was necessary. In addition, the provider thereby agrees to comply with all regulations set forth in this subpart concerning the rendering of treatment and/or the process for seeking payment for medical services, including the limitation imposed on the amount to be paid for such services.

(e) In summary, bills submitted by providers must: Be itemized on Form OWCP-1500 or CMS-1500 (for physicians), Form OWCP-04 or UB-04 (for hospitals), or an electronic or paper-based bill that includes required data elements (for pharmacies); contain the signature or signature stamp of the provider; and identify the procedures using HCPCS/CPT codes, RCCs, or NDC numbers. Otherwise, the bill may be returned to the provider for correction and resubmission. The decision of OWCP whether to pay a provider's bill is final when issued and is not subject to the adjudicatory process described in subpart D of this part.

20 C.F.R. § 30.701.

23.     Under EEOICPA implementing regulations, a false and misleading statements of material fact in a reimbursement request is sufficient justification for the United States of America to refuse payment:

A physician, hospital, or provider of medical services or supplies shall be excluded from payment under this part if such physician, hospital or provider has:

a) Been convicted under any criminal statute of fraudulent activities in connection with any federal or state program for which payments are made to providers for similar medical, surgical or hospital services, appliances or supplies;

(b) Been excluded or suspended, or has resigned in lieu of exclusion or suspension, from participation in any federal or state program referred to in paragraph (a) of this section;

(c) Knowingly made, or caused to be made, any false statement or misrepresentation of a material fact in connection with a determination of the right to reimbursement under this part, or in connection with a request for payment;

(g) Knowingly furnished treatment, services or supplies which are substantially in excess of the employee's needs, or of a quality which fails to meet professionally recognized standards;

20 C.F.R. § 30.715(c)(g).

24.     A necessary precursor to exclusion, resignation, or suspension from a federal or state program is a participants's initial enrollment in such a program. Here, in many states where the Defendant provides services under the EEOICPA program, Defendant has made no effort to enroll as a licensed home healthcare provider.

25.     In addition, the Department's enrollment forms which PCM must sign to be eligible to charge for services under the EEOICPA program require PCM to list licensing information for each individual applicant to receive services.

26.     PCM's instructional materials which instruct individual benefit applicants how to complete the application form indicates that both the license number and the issuing

7

state must be on each enrollment application. Below that notation and in red font, the enrollment form states that if data is missing from these fields, the application will be returned to the provider.

27.     The specific location where services are provided is material to EEOICPA program's payment structure:

> For professional medical services, OWCP shall maintain a schedule of maximum allowable fees for procedures performed in a given locality. The schedule shall consist of: An assignment of a value to procedures identified by HCPCS/CPT code which represents the relative skill, effort, risk and time required to perform the procedure, as compared to other procedures of the same general class; an index based on a relative value scale that considers skill, labor, overhead, malpractice insurance and other related costs; and a monetary value assignment (conversion factor) for one unit of value in each of the categories of service.

20 C.F.R. § 30.706.

> Payment for a procedure identified by a HCPCS/CPT code shall not exceed the amount derived by multiplying the relative values for that procedure by the geographic indices for services in that area and by the dollar amount assigned to one unit in that category of service.

> (a) The "locality" which serves as a basis for the determination of average cost is defined by the Bureau of Census Metropolitan Statistical Areas. OWCP shall base the determination of the relative per capita cost of medical care in a locality using information about enrollment and medical cost per county, provided by the Centers for Medicare and Medicaid Services (CMS).

20 C.F.R. § 30.707.

28.     Unsurprisingly, forms required for reimbursement claims under the EEOICPA program – such as the OWCP 1500 and the CMS 1500 – require such information as "rendering provider ID #," which provides the Department easy access to the address of the service provider as registered with the program.

## IV.    FACTUAL ALLEGATIONS

### A.   Summary of Allegations

29.    PCM willfully and deliberately operates in eight (8) states in which it is unlicensed, in one (1) state in which it continues to practice outside the scope of its fraudulently obtained license, and in one (1) state in which it practices outside of the scope of its provisional license (which is pending formal approval), all in violation of Department and multiple state regulations.

30.    PCM commits additional fraud in (a) billing for certified nursing care provided by uncertified and unqualified employees and (b) submitting requests for payment to Department which are generated using provider notes that are routinely altered by PCM without regard to the level and amount of patient care actually administered.

31.    These practices not only lead to fraud against the United States of America, but also compromise the integrity of patient care and put patients in danger.

32.    Indeed, PCM has refused to report significant patient care issues, placing patients in severe risk of harm, so that the company can continue to operate its fraudulent scheme undetected.

33.    PCM defrauds the EEOICPA program by routinely and knowingly providing medical services that are not medically necessary and by providing medical services through employees who are not qualified to provide such services, both in violation of 20 C.F.R. § 30.403 and 20 C.F.R. § 30.715(g).

34.    The home healthcare industry is regulated by individual states to ensure that all businesses providing home health care services within a community adhere to a minimum standard of care regarding – among other things – employee training and the reporting of patient abuse, neglect, and exploitation.

35.     The United States Department of Labor requires its contractors to comply with the licensing requirements for each individual state in which contractors operate.

36.     Individual states are authorized to monitor compliance of home healthcare providers through regular surveys of the files and procedures of each licensed provider.

37.     Operating out of compliance with state licensing requirements is unlawful. Not only do licensing requirements protect the safety and wellness of employees and patients, but they also ensure fair competition among businesses offering similar services by requiring each provider adheres to the same industry standards.

38.     The violations of state licensing requirements and other violations described herein are being conducted by the Defendant on a nation-wide basis.

39.     Indeed, PCM President Greg Austin has expressed his belief that obtaining licensure and attempting legal compliance is punitive to business owners because (in his view) no company can be in fully compliance with all legal regulations. For that reason, Austin has caused PCM to not even attempt to be in legal compliance; instead, PCM chooses to flaunt the law for higher profits.

40.     Austin, Vollmer, and PCM have taken this position to the extreme by deliberately choosing not to attempt to comply with licensing and other requirements, even though PCM's actions put patients at risk. To accomplish this fraud, PCM routinely and knowingly makes false statements in connection with its requests for payment, in violation of 20 C.F.R. § 30.701(d) and 20 C.F.R. § 30.715(c).

41.     The false claims created by these practices in addition to the false statements made by PCM as a result are material to Department's decision to pay PCM. The false statements include knowing and intentional misrepresentations about, *inter alia*, the nature

and quantity of services provided, the eligibility and fitness of PCM's employees to provide medical services, and the location where services are provided.

**B. PCM fraudulently bills the Department for services provided in states where PCM is not licensed.**

42.     One of PCM's business activities is seeking out individuals across the country who are potentially eligible for EEOICPA benefits and assisting those individuals in enrolling and obtaining benefits through the EEOICPA program.

43.     Once claimants are enrolled in the EEOICPA program, PCM provides them with support to complete the necessary paperwork, authorizations, and administrative support functions, which are required by the Department to obtain health care services and benefits under the EEOICPA.

44.     PCM submits claims for such health care services to a third-party billing provider currently operating under the name Conduent, Inc. (NYSE: CNDT), which has a contract to handle billing administration under the EEOICPA.

45.     PCM also recruits individual home healthcare providers to provide services to individuals enrolled in the EEOICPA program. Defendant uses billing software from Great Plains Billing System to generate bills to submit to Conduent.

46.     The forms used to submit payment requests to the Department include the patient ID number, the medical provider ID number (which has a unique identifier and states the address of the provider as registered for the program), the current procedural terminology ("CPT") billing code for the services provided, and the number of units provided for the CPT code.

47.     If the listed agency provider (*i.e.*, PCM) and the receiver of the services are both registered with the EEOICPA program, Conduent then pays the claim on behalf of the Department of Labor.

48.     Yet, for years and on an ongoing basis, PCM has knowingly and intentionally operated in multiple states without obtaining proper and required licenses.

49.     In the course of her duties as Senior Director of Clinical Operations at PCM, Ms. McIver has obtained documentation that PCM currently hires individuals and bills for the services provided in at least eight (8) states in which PCM has not obtained a proper operating license. Those states include Florida, Georgia, Utah, Nevada, Illinois, Idaho, North Carolina, and Oregon.

50.     Furthermore, in the course of her duties, Ms. Ohnstad learned that PCM was additionally operating without a license in the States of Indiana, Wyoming, and Arkansas, and in counties in Tennessee and Kentucky where it is unlicensed.

51.     PCM submits bills to Conduent (which are paid by the Department of Labor for patients who reside in states in which PCM is not licensed) by falsely using provider identifications from three (3) states in which PCM actually is licensed: Colorado, Tennessee and New Mexico.

52.     PCM fraudulently induces the Department to pay for services using payment request forms which simply show (1) an approved program beneficiary and an (2) approved provider, albeit a provider licensed in a different state than the PCM entity which provided services to the patient.

53.     Therefore, because PCM actively obscures its provision of services where it is not licensed to operate, the Department of Labor is not aware of the fraud.

54.     PCM's misrepresentation of the provider, which provides services to EEOICPA program participants is material to the Department's decision to pay PCM for services.

### C.  PCM's Texas operations demonstrate the staggering scale of its fraud.

55.     PCM operated in Texas without a license for five (5) years beginning in 2011 before PCM first attempted to apply for a provisional license in December 2016.

56.     Neither the Department of Labor nor the State of Texas knew that PCM was operating in Texas without a license, because PCM actively misled the Department and the State of Texas about its activities.

57.     Per PCM's nationwide policy, the patient files for the approximately sixty (60) patients being treated by PCM healthcare providers in Texas and the employee files for the approximately ninety (90) PCM employees located in Texas were kept in Colorado and billed as if the services had been rendered in Colorado by Colorado-based employees.

58.     In 2016, PCM applied for a provisional license in Texas after it had been unlawfully operating in Texas for five (5) years. Once PCM submitted to the licensing procedure, PCM could no longer hide from the State of Texas regulatory survey of patient and employee files.

59.     In preparation for PCM's first survey in Texas, PCM President Greg Austin required Ms. McIver to falsify a select few Texas patient and employee files to falsely indicate to Texas authorities that the employees were hired *after* PCM's license application had been submitted. The falsified documents further falsely indicated that the patients had been admitted for care *after* the license application had been submitted.

60.     Acceding to President Austin's demands was a term and condition of Ms. McIver's continued employment at PCM. In connection with his instructions to Ms.

McIver to falsify documents, Austin regularly reminded her that if she did not do as he demanded, somebody else would follow his instructions and that he might have to "restructure" PCM (*i.e.*, fire her).

61.     These and other threats left no doubt that Ms. McIver would lose her job should she refuse Mr. Austin's orders.

62.     Austin exerted similar pressure upon Ms. Ohnstad by threatening her job if she did not accede to his instructions.

63.     Ms. McIver did what Austin had instructed her to do and picked two (2) patients for whom she created new patient files and three (3) employees whose employment files were altered to comply with the requirements of the Texas provisional license.

64.     PCM did not disclose the remainder of the Texas patient and employee files to the State of Texas during the licensing procedure, and in fact actively covered them up.

65.     As a result of PCM's fraudulent misrepresentations, when the State of Texas surveyed PCM for its provisional license, it appeared to the surveyor that PCM had only two (2) patients and three (3) employees in the state of Texas.

66.     In reality, PCM continued to serve over sixty (60) patients and employ ninety (90) employees who remained undisclosed to the State of Texas.

67.     After the State of Texas interviewed one (1) of the employees disclosed by PCM during the licensing process, Chief Operating Officer Brad Drevno instructed the two (2) other employees PCM had chosen to disclose not to answer the phone when the surveyor called to interview them.

68.     PCM made this instruction with the goal of preventing the Texas surveyor from discovering its fraudulent activities.

69.     PCM's fraud in Texas went undetected during the survey, and the State of Texas granted PCM an operating license in November 2017.

70.     PCM has continued to falsify the files of existing Texas patients and employees to appear as new patients and new hires in Texas to thwart discovery of the fraud by scheduled licensing surveys in Texas.

71.     PCM continues to defraud the Department of Labor by billing for unlicensed operations in Texas as it continues to treat the majority of its Texas patients, who have not yet been disclosed to the state licensing authority.

72.     In a meeting with Ms. McIver and Ms. Ohnstad in or about April 2017 (which Ms. Ohnstad audio recorded), PCM President Greg Austin explained PCM's plan to follow the same fraudulent scheme with respect to licensure in Texas that it had previously followed in Washington State.

73.     Austin stated that after PCM's application for a license in Texas had been approved, PCM would file paperwork for a patient's "re-admission" to PCM's care (though PCM had actually been treating the patient all along).

74.     PCM would follow this process for each of the patients it had already been treating in Texas, but would create the admission paperwork with a falsified admission date *after* the date PCM's Texas license was approved. Austin's goal was to make it harder to detect the fact that PCM had been treating the patients illegally in Texas.

75.     PCM followed this process with the intent of misleading Texas authorities to believe that PCM had not admitted patients before its licensure date.

76.     Throughout the inspection process that followed approval of the license, PCM would gradually re-admit new patients with falsified admission dates with the goal of not alerting state inspectors to the scheme.

77.     During the recorded April 2017 meeting, Austin explained that it was imperative that PCM properly manage the flow of paperwork so PCM would not be caught re-admitting patients it had already been treating before approval of its license.

78.     Of course, by not seeking a license in Texas as an agency, PCM avoided paying required licensing fees set forth in the Texas Health and Human Services Licensing standard for Home and Community Support services Agencies Subchapter A § 97.3. While these fees are not particularly burdensome, they nonetheless are owed to the State of Texas for at least five years.

79.     PCM follows the process of not obtaining appropriate licenses in at least eight (8) other states besides Texas, where it only obtained its license through fraud.

### D. PCM fraudulent activities – including operating without proper licensure – puts patients at risk.

80.     PCM's decision to conduct much of its operations without proper regulatory oversight also necessarily puts patients at risk.

81.     When PCM provides services in states where it is unlicensed, any negligent care administered by untrained employees, patient abuse, and exploitation will also escape detection.

82.     Part of the reason why state licensing authorities exist is to ensure that proper procedures are in place for mandatory employee training and reporting of patient abuse and exploitation.

83.     Relator McIver has received emails confirming that in states where PCM operates without the required license, PCM does not require – or even offer – employee training that would otherwise be mandatory under state licensing regulations.

16

84.     Therefore, PCM employees are not only unlicensed, but they are also unqualified to be licensed, further putting patients at risk of exploitation, abuse, injury, or death.

85.     Because many of its employees are unlicensed, PCM avoids substantial costs of training employees and paying those employees while they are being trained. PCM therefore prefers to operate without licenses because it saves such costs in multiple states, but to do so it operates illegally.

86.     These fraudulent practices have led directly to abuse, neglect, and inadequate patient care.

87.     For example, both Plaintiff-Relators are aware of an incident of patient abuse that occurred in Texas on March 16, 2017, before PCM fraudulently obtained a license to operate in Texas. PCM regional director Kimberly Munger notified both Ms. McIver and Ms. Ohnstad about this incident.

88.     When Ms. McIver learned of the report of abuse, she promptly brought it to the attention of PCM President Greg Austin.

89.     Despite Texas's licensing requirement that incidents of patient abuse must be reported, Austin instructed both Ms. McIver and Ms. Ohnstad not report the incident of abuse. *See e.g.*, Texas Health and Human Services Licensing Standard for Home and Community Support services Agencies Subchapter A § 97.249 for reporting requirements.

90.     Austin explained that if either Ms. McIver or Ms. Ohnstad reported the abuse, the report would also disclose that PCM was operating a home healthcare business without a proper license.

91.     Ms. McIver is personally aware of other incidents of patient exploitation involving drug diversion and theft that have also gone unreported in states in which PCM operates without a license.

92.     Having learned that it is better for its business to avoid making such reports, even in states where PCM does choose to obtain a license, PCM often does not follow state requirements to report such incidents.

93.     PCM recently adopted a companywide policy that only Greg Austin or Chief Operating Officer Brad Drevno may report incidents of abuse or neglect to licensing authorities. The policy further requires that all such incidents must be reported to Austin and/or Drevno.  *See, e.g*, the Washington State Elder and Vulnerable Adult Placement Referrals law of 2011.

### E.  *PCM fraudulently bills for services provided by unqualified employees.*

94.     In 2016, PCM adopted a corporate initiative to schedule more Patient Care Assistant shifts as opposed to scheduling more expensive Certified Nursing Assistants for the same shift.

95.     PCM can pay a Patient Care Assistant a significantly lower hourly rate than a Certified Nursing Assistant, so PCM's profit margin on services rendered by Certified Nursing Assistants is lower. The Department pays only two dollars ($2.00) per hour less for a Patient Care Assistant shift.

96.     During this initiative, Ms. McIver learned that Washington State licensing regulations required employees with a higher level of certification to be staffed on home healthcare shifts that PCM typically staffed with a Patient Care Assistant.

97.     After Ms. McIver uncovered this licensing violation, Chief Operating Officer Brad Drevno decided that PCM would not change its staffing practices in Washington State, despite knowing that its practices violated state regulations.

98.     PCM received a "deficiency" during its June 2017 survey in Washington State for the same illegal practice.

99.     In response to the "deficiency" rating, PCM chose to remedy the violation only to the extent that had been discovered in a handful of the scheduled shifts, and otherwise continued this practice.

100.    When Ms. McIver last investigated the status of PCM's ongoing violations in Washington State in October 2017, she learned that PCM had continued to schedule Patient Care Assistants to work shifts that require a higher level of certification in Washington State.

101.    Moreover, Ms. McIver also uncovered that PCM intentionally schedules Patient Care Assistants for Certified Nursing Assistant shifts and fraudulently bills the Department at the higher Certified Nursing Assistant rate.

102.    PCM employs approximately eighty (80) uncertified employees in Washington State for one hundred (100) patients.

103.    PCM continues to compromise patient care in Washington State to defraud the Department and maximize its own profits.

104.    Ms. McIver uncovered this fraud due to her access to information from serving on an oversight committee in Washington State.

### F.      *PCM provides unlawful incentives to employees to increase care levels.*

105.    PCM Regional Managers receive bonuses based in part on "census" (*i.e.*, the number of patients under PCM's care in the manager's region) and the level of care the

company provides to such patients. Bonuses are generally fifteen percent (15%) of salary for most managers, and sales personnel have similar incentives. As a result of this financial incentive, PCM engages in illegal activity to increase revenue even in states where it is lawfully operating.

106.    For example, the amount of money paid to Defendant varies substantially between the three "levels" of care that it can provide to participants in the EEOICPA program. PCM exerts pressure to provide "level three" care (which is in home care twenty-four hours day, seven days a week) even when not medically necessary, because level three care is the most lucrative for PCM.

107.    To induce patients to accept more profitable (but medically unnecessary) levels of care, PCM sales people frequently mention to patients that family members can be hired to provide some of the care.

108.    While it is legal to hire family members of patients to provide some services, PCM does so to induce patients to accept additional services for which Defendant can bill.

109.    The federal "Anti-Kickback" statute prohibits knowingly and willfully offering, paying, soliciting or receiving any remuneration to induce a person (a) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (b) to purchase, lease, order, arrange for or recommend any good, facility, service or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1) and (2). A violation of the Anti-Kickback Statute constitutes a felony punishable by fines of up to $25,000 and imprisonment for up to five years.

110. Unlawful remuneration is broadly construed to include any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, for referrals, subject to specific exclusions. 42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

111. Further, the Anti-Kickback statute is violated if even one purpose of remuneration is to induce referrals, even if other, legitimate purposes are also present. *U.S. v. Greber*, 760 F.2d 68, 69 (3rd Cir. 1985), *cert. denied*, 474 U.S. 988 (1985).

112. Compliance with the Anti-Kickback statute is required for reimbursement of federal program claims, and claims made in violation of the law are actionable under the False Claims Act. See 42 U.S.C. § 1320a-7b(g) (2010) (A "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act].").

### G. Pressure to keep patients enrolled hurts PCM's quality of care.

113. Pressure by PCM management to keep patients enrolled and receiving EEOICPA benefits also causes PCM's failure to report serious and potentially life-threatening safety issues with patients.

114. By way of example, in New Mexico a nurse working for PCM reported that she believed that the son of the patient who had been hired by PCM was dangerous to the patient father.

115. Specifically, the nurse and other PCM employees reported being afraid to leave the father alone with the son, as the son was attempting to "waterlog" the father by giving the man an excessive amount of water, which can be injurious or fatal.

116. After hearing the complaint, Greg Austin instructed Ms. McIver to ensure that the caregiver did not report her concerns, because it could jeopardize PCM's ability to bill for the patient.

117.     Rather than remove the son as his father's caretaker or take any other action, PCM continues the practice and has refused to report the possible threat to the patient's health.

118.     PCM has refused to address patient safety issues many times, solely for the sake of profit.

### G. PCM defrauds the Department of Labor by unlawfully editing and falsifying provider notes in patient files.

119.     As a regular practice, PCM's billing department alters provider notes in patient files regarding the amount of billable time that providers have spent with patients. This altered information directly results in fraudulently inflated billing to the Department.

120.     Specifically, the time billed by PCM is greater than the time as reported by the care provider.

121.     When this practice was reported to PCM Chief Financial Officer Curtis Fletcher his response was to retaliate against the employee who reported the fraud, billing manager John Gillete, by demoting Gillete in October 2017.

### IV.     VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

### COUNT I
### 31 U.S.C. §§ 3729(a)(1)(A) Liability for False Claims

122.     Plaintiff-Relators re-allege and incorporate each and every paragraph set forth above and below.

123.     PCM has violated and continues to violate the False Claims Act, 31 U.S.C. § 3729 (a)(1)(A) by knowingly submitting or causing the submission of claims for payment to the Department of Labor in violation of material requirements of the EEOICPA program including, but not limited to, the requirement that PCM be licensed in and follow the laws

of each state where it provides home health care agency services which form the basis of claims for payment.

124.    In addition, PCM (a) has engaged in and continues to engage in the provision of services by personnel not qualified to provide such services under state law; (b) charges the Department for services it has not provided; (c) fraudulently inflates the qualifications of personnel hired so as to charge higher rates for such services; and (d) provides illegal incentives to patients to inflate such services in violation of the federal Anti-Kickback Statute.

125.    PCM also acted while responsible to provide such services, to hide reports of serious incidents of abuse, and neglect of their patients so that their fraudulent scheme would not be discovered.

126.    Each of these practices is a material violation of the conditions required to participate in and charge for services under the EEOICPA program, and is done despite certifications that PCM would follow and does follow program requirements and governing law.

127.    Any resulting claim for services made by PCM is materially false.

128.    Had the Department of Labor been aware of the falsity of such claims it would not have paid for the services PCM claimed to provide.

129.    The Defendants are liable for three (3) times the amount of damages created by such false claims made to the United States of America.

130.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of between five thousand five hundred dollars ($5,500) and eleven thousand dollars ($11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990. As of 2018, the current maximum civil fine for each violation of

the False Claims Act is twenty-two thousand three hundred sixty three dollars ($22,363) which amount is subject to further adjustment. See Federal Register Vol. 83 No. 19, 3945 (January 20, 2018).

## COUNT II
### 31 U.S.C. §§ 3729(a)(1)(B) Liability for False Statements and Records

131.   Plaintiff-Relators re-allege and incorporate each and every paragraph set forth above and below.

132.   In presenting or causing the presentment of such false claims to the United States, the Defendants' request for payments also relied upon false statements and false records, in violation of 31 U.S.C. § 3729 (a)(1)(B).

133.   The Defendants specifically hid the fact that they were providing services in states in which they were not licensed and deliberately falsified records to do so.

134.   Defendants also hid from inspections and used care providers who were not qualified according to state law and billed for more time than they provided each such action requiring false documentation.

135.   The Defendants are liable for three (3) times the amount of damages created by such false claims made to the United States of America.

136.   Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of between five thousand five hundred dollars ($5,500) and eleven thousand dollars ($11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990. As of 2018, the current maximum civil fine for each violation of the False Claims Act is twenty-two thousand three hundred sixty-three dollars ($22,363) which amount is subject to further adjustment. See Federal Register Vol. 83 No. 19, 3945 (January 20, 2018).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relators, on their own behalf and on behalf of the United States of America, request that judgment be entered in their favor and against Defendants as follows:

(a) That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq*.;

(b) That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus any increase allowed for such civil penalties as specified under the Federal Civil Penalties Adjustment Act of 1990;[1]

(c) That Plaintiff-Relators be awarded an amount that the Court decides is reasonable, which shall not be less than fifteen percent (15%) and not more than thirty percent (30%) of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States of America, and/or third parties;

(d) That Plaintiff-Relators be granted a trial by jury;

(e) That the Plaintiff-Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d) and similar provisions of the Sate False Claims Acts listed herein;

---

[1] As of 2018, the maximum civil fine amount for each violation of the False Claims Act is $22,363 and is subject to further adjustment. See Federal Register Vol. 83 No. 19, 3945 (January 20, 2018).

(f) The United States, and the Plaintiff-Relators recover such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

KING & GREISEN, LLP and
PRICE BENOWITZ, LLP

By:

*/s/ Diane S. King*
Diane S. King
Hunter A. Swain
KING & GREISEN, LLP
1670 York Street
Denver, CO 80210
Phone: (303) 298-9878
Fax:    (303) 298-9879

/s/ Anthony C. Munter
Anthony C. Munter
PRICE BENOWITZ, LLP
409 Seventh Street, Northwest
Washington, D.C. 20004
Phone: (202) 417-6000
Fax:    (202) 664-1331

*Attorneys for Plaintiffs-Relators*